UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KATIE KIENTZY, *on behalf of J.P.,* | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     No. 4:15 CV 707 JMB |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM AND ORDER</u>**[1]

Katie Kientzy ("Plaintiff"), on behalf of J.P., a minor, appeals the decision of the

Commissioner of Social Security ("Defendant") denying disability benefits under Title XVI of

the Social Security Act. Because Defendant's decision is supported by substantial evidence, as

discussed below, it is affirmed. <u>See</u> 42 U.S.C. § 1383(c)(3).

**I.**      **<u>Procedural and Factual Background</u>**

On April 18, 2012, Plaintiff filed an application for disability benefits on behalf of J.P., a

child under the age of eighteen. (Tr.[2] 103) Plaintiff's application alleged that J.P. suffers from:

(1) autism; and (2) attention deficit hyperactivity disorder ("ADHD"). (Tr. 55) This application

was denied, and Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").

(Tr. 55, 66-68) Plaintiff appeared (with counsel) at the hearing on January 14, 2014. (Tr. 33-54)

In a decision dated February 25, 2014, the ALJ found that J.P. was not disabled. (Tr. 7-32)

Plaintiff appealed that decision, but the Appeals Council declined review. (Tr. 1-3) Plaintiff has

exhausted her remedies, and the matter is properly before this Court. <u>See</u> 42 U.S.C. § 1383(c).

---

[1] This matter is before the Court for judicial review pursuant to 42 U.S.C. § 1383(c)(3),
and with the consent of the parties under 28 U.S.C. § 636(c).

[2] References to "Tr." are to the administrative record filed herein by the Commissioner.

J.P. was an 11 year old boy at the time of the administrative hearing in this matter. (Tr. 35) J.P. suffers from an autism-spectrum disorder and ADHD. At the hearing, both Plaintiff and J.P. testified regarding the nature of J.P.'s disabilities and symptomatology. (Tr. 33-54) Among other symptoms, J.P. allegedly fights continuously with his sister, expresses negative thoughts about himself, and has trouble interacting with other children. (Tr. 42, 44, 47) J.P.'s mother testified that J.P. sometimes engages in "self-injurious behavior." (Tr. 41) J.P. attended an alternative school from August of 2010 until August of 2013, because he "had severe behavioral problems" that the local traditional school "could not accommodate." (Tr. 41) By August of 2013, however, J.P. transitioned to a regular, mainstream school, where he has been succeeding educationally, including placement on the honor roll. (Tr. 190, 396-99)

After hearing Plaintiff's and J.P.'s testimony, and reviewing the objective medical records and other evidence in this case, the ALJ ultimately found J.P. not disabled. (Tr. 27) In arriving at this decision, the ALJ followed the three-step inquiry that applies in child disability cases, as set out in the Commissioner's regulations. See 20 C.F.R. § 416.924(a).

At step one, the ALJ found that J.P. was a school-age child on the date of the application, and that he was not engaged in substantial gainful activity. (Tr. 13) At step two, the ALJ found that J.P. had the following severe impairments: (1) Asperger's syndrome versus oppositional defiant disorder; (2) attention deficit hyperactivity disorder (ADHD); and (3) obesity. (Id.) At step three, the ALJ determined that none of J.P.'s severe impairments: (i) met; (ii) medically equaled; or (iii) functionally equaled a Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14) In conducting his step three inquiry, the ALJ focused on Listing 112.10 (other pervasive developmental disorders) and Listing 112.11 (ADHD). (Id.) The ALJ held that none of J.P.'s severe impairments "met" or "medically equaled" either of those Listings.

In analyzing whether J.P.'s severe impairments "functionally" equaled a Listing, the ALJ evaluated J.P.'s functioning within the six required domains.[3] The ALJ found that J.P. had "marked" limitations in the domain of interacting and relating to others; but he found that J.P. had less than "marked" limitations in the remaining five domains.[4] Because J.P. did not suffer "extreme" limitations in one domain, or "marked" limitations in two domains, the ALJ found that there was no functional equivalence between J.P.'s impairments and a Listing. (Tr. 19-27)

In conducting his analysis, the ALJ made several credibility findings and determinations in which he weighed the evidence. For example, the ALJ found that Plaintiff and J.P. were "not entirely credible" concerning the limiting effects of J.P.'s symptoms. (Tr. 16) Regarding the medical opinion evidence, the ALJ partially credited the opinion evidence of J.P.'s treating psychiatrist, Dr. Lisa Delaney, M.D., agreeing with her that J.P. had marked limitations in interacting and relating with others; but disagreeing with Dr. Delaney's opinion that J.P. has marked limitations in (1) attending and competing tasks and (2) caring for himself. (Tr. 18)

Additionally, the ALJ gave "some weight" to Dr. Joan Singer, Ph.D., a state agency non-examining doctor who reviewed the medical files in J.P's case. (Tr. 18-19) Dr. Singer found that J.P. had marked limitations in interacting and relating to others, but no additional limitations in any other domain. (Tr. 546-52) The ALJ agreed with Dr. Singer's assessment regarding the domain of interacting and relating to others, but disagreed that J.P. had no other limitations—the ALJ thought it more accurate to find that J.P. had "less than marked" limitations in the remaining domains. (Tr. 18)

---

[3] As will be explained in more detail below, for severe impairments to "functionally equal" a Listing, a claimant must have "extreme" limitations in one domain, or "marked" limitations in two domains. See 20 C.F.R. § 416.926a(d).

[4] The other five domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) moving about and manipulating objects; (4) caring for yourself; and (5) health and physical well-being.

Finally, the ALJ gave "great weight" to the opinion of J.P.'s teacher at the alternative school, Dave Haessig. (Tr. 19) Mr. Haessig thought that J.P. had moderate limitations in the domain of acquiring and using information; mostly moderate limitations in attending and completing tasks; no limitations in moving about and manipulating objects; mostly moderate or no limitations in caring for self, along with mostly no limitations in areas of health and physical well-being. (Tr. 153-159) Taking all of this evidence into account, the ALJ found that Plaintiff had not met her burden in proving that J.P's impairments functionally equaled a Listing. (Tr. 27) Therefore, the ALJ concluded that J.P. was not disabled under the law. (Id.)

On appeal to this Court, the parties dispute: (1) whether the ALJ properly considered the effects of a structured setting on J.P.'s level of functioning; and (2) whether the ALJ properly considered the opinion evidence in the record. After the initial briefing in this case, the Court ordered oral argument on the first question disputed by the parties, in an effort to ensure that the Court applied the correct legal standards and properly addressed the relevant facts. The Court also gave the parties the option of submitting additional briefing. Defendants submitted additional briefing, and both parties appeared for oral argument on July 7, 2016. After hearing from the parties, the Court took the matter under submission.[5]

## II.    Legal Framework and Standard of Review

Children from low income families may receive Title XVI benefits if certain income and asset requirements are met, and if the child qualifies as "disabled." See 42 U.S.C. § 1382(a)(1). A child under the age of eighteen is disabled if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous

---

[5] The Court has considered the entire record, and additional facts will be discussed as they are relevant.

period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(C)(i).  As noted above, the Commissioner employs a three-step sequential evaluation process to determine whether a child meets this definition.  See 20 C.F.R. § 416.924.

At step one, the Commissioner determines whether the child is engaged in "substantial gainful activity."  If so, the claim is denied; if not, the Commissioner moves on to step two.  See 20 C.F.R. §§ 416.924(a), (b).  At step two, the Commissioner determines whether or not the child suffers from any impairments or combination of impairments that are "severe."  20 C.F.R. § 416.924(a).  Under these rules, an impairment is not severe if it "causes no more than minimal functional limitations."  See 20 C.F.R. § 416.924(c).  If the child suffers from an impairment or combination of impairments that qualifies as "severe," the analysis moves to step three.  At step three, the Commissioner determines whether the child has a severe impairment or combination of impairments that:  (1) meets; (2) medically equals; or (3) functionally equals a listed impairment set forth in Appendix 1 of 20 C.F.R. pt. 404, subpart P.  See 20 C.F.R. § 416.924(d).

To "meet" or "medically equal" a Listing, a child's severe impairment must meet the severity criteria for an individual Listing impairment.  See id.  But if a child has a severe impairment or combination of impairments that does not "meet" or "medically equal" any Listing, the Commissioner will analyze whether the child has limitations that "functionally equal" the Listings of disabling conditions.  See 20 C.F.R. § 416.926a(a).

In considering functional equivalence, the Commissioner looks at how the child's impairment(s) affect "broad areas of functioning," known as "domains."  See 20 C.F.R. § 416.926a(b)(1).  To equal a Listing functionally, the impairment(s) must result in "marked

limitations"[6] in two domains of functioning, or an "extreme"[7] limitation in one domain. There are six domains:

> (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating to others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.

See 20 C.F.R. § 416.926a(d). If a claimant fails to meet the burden at any of these three steps, the ALJ must find the child not disabled. See 20 C.F.R. § 416.924(a).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 963 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the

---

[6] A "marked" limitation is one which "interferes seriously with your ability to independently initiate, sustain, or complete activities … [m]arked limitation also means a limitations that is more than moderate, but less than extreme. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).

[7] An "extreme" limitation is one which "interferes very seriously with your ability to independently initiate, sustain, or complete activities … [e]xtreme limitations also means a limitation that is more than marked. Extreme limitation is the rating we give to the worst limitations. However, "extreme" limitation does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## III. Discussion

As noted above, the parties dispute whether the ALJ properly considered the effects of a structured setting on J.P.'s level of functioning, and whether the ALJ properly considered the opinion evidence in the record. The Court concludes that the ALJ properly considered both of those issues, and that the decision of the ALJ in this matter is supported by substantial evidence.[8]

### A. ALJ's Consideration of J.P.'s "Structured Environment"

Plaintiff's first argument is that the ALJ failed to consider the effects of a structured environment on J.P.'s ability to function. (ECF No. 16 at 3) As Plaintiff points out, the ALJ must consider the effect of a structured environment on a claimant's symptomatology:

---

[8] The Court notes at the outset that the ALJ also discounted Plaintiff's and J.P.'s credibility concerning the intensity, persistence and limiting effects of J.P.'s symptoms. (Tr. 16) Plaintiff does not challenge the ALJ's adverse credibility finding. Even if Plaintiff had challenged it, however, the ALJ gave good reasons for his adverse credibility determination and therefore, it is entitled to deference in this Court. See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.").

[I]f your symptoms or signs are controlled or reduced in a structured setting, we will consider how well you are functioning in the setting and the nature of the setting in which you are functioning (e.g., home or a special class); the amount of help you need from your parents, teachers, or others to function as well as you do; adjustments you make to structure your environment; *and how you would function without the structured or supportive setting*.

20 C.F.R. § 416.924a(b)(5)(iv)(E) (emphasis added).

Similarly, the preamble to the child's Listing of impairments for mental impairments includes the following language:

As with adults, children with mental disorders may be placed in a variety of structured settings outside the home as part of their treatment. Such settings include, but are not limited to, psychiatric hospitals, developmental disabilities facilities, residential treatment centers and schools, community-based group homes, and workshop facilities. The reduced mental demands of such structured settings may attenuate overt symptomatology and superficially make the child's level of adaptive functioning appear better than it is. Therefore, the capacity of the child to function outside highly structured settings must be considered in evaluating impairment severity. This is done by determining the degree to which the child can function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis outside the highly structured setting.

20 C.F.R. pt. 404, subpart P, app. 1 § 112.00E.

It is clear, therefore, that the ALJ was required to consider how J.P. could function outside of a highly-structured setting. Plaintiff argues that the ALJ omitted this analysis. Plaintiff notes that J.P. required a structured treatment at the alternative school, including an Individualized Education Plan ("IEP"), and a "therapeutic environment." (ECF No. 16 at 4-5) Plaintiff also contends that J.P. continued to need a structured environment when he was at his mainstream school, including "accommodations" at his new school, and the presence of a "para-

professional."[9]  (Id. at 5)  Plaintiff argues that despite all of this evidence of a "structured" environment around J.P., "the hearing decision failed to mention the issue of a structured or supportive setting," resulting in reversible error.  (Id. at 5)  Therefore, Plaintiff contends that the case should be remanded.

Defendant responds by arguing that the ALJ was required to *consider* the structured environment, but he did not have to explicitly cite the controlling regulation.  Additionally, Defendant argues that the "relevant question is whether or not the evidence shows that J.P. can function outside of" a structured environment.  (ECF No. 17 at 5)  Defendant points to the ALJ's analysis of J.P.'s success at his mainstream school, and the improvement that J.P. made in order to be ready for a mainstream school as evidence that J.P.'s functioning is increasing, even as his environment became less structured.  Therefore, Defendant contends that the ALJ substantially complied with his obligation to consider J.P.'s structured environment, even though he did not cite the controlling regulations.

As an initial matter, the Court agrees that the ALJ was required to understand the nature of J.P.'s structured environment, and analyze how that environment affected J.P.'s functioning. But while the law dictates that the ALJ *consider* the impact of J.P.'s structured environment, the law is not as strict as Plaintiff's arguments suggest.  For example, the ALJ is not required to cite the regulations or to follow a particular format in carrying out this duty.  See Welsh v. Colvin, 765 F.3d 926, 929 (8th Cir. 2014) (noting that ALJ's failing to cite relevant Social Security Ruling was harmless error when ALJ conducted the required analysis); see also Johnson ex rel.

_____

[9] J.P.'s para-professional accompanies J.P. at school, to help him transition from the alternative school to the mainstream school.  The para-professional monitors J.P., in order to "diffuse any problems," such as if J.P. becomes stressed, or "over stimulated."  This person sometimes takes J.P. out of classes when he is becoming upset, and "intervene[s] before it gets to the meltdown stage."  (Tr. 40)

A.J. v. Astrue, 2013 WL 1187436 at *15 (S.D.N.Y. Mar. 22, 2013) ("Although an ALJ is required by regulation to consider the factors related to functioning in a supportive and structured setting, that 'regulation does not command the ALJ to explicitly discuss his consideration.'") (internal citations omitted).

Here, when viewed in the context of the ALJ's entire decision, and the whole record, the ALJ adequately discharged his duty to *consider* J.P.'s functioning outside of his structured environment. First, the ALJ explicitly noted that he considered "all of the relevant evidence," including "objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parents or other caregivers); and any other relevant evidence in the case record, *including how the claimant functions over time and in all settings (i.e. at home, at school, and in the community)*." (Tr. 15) (emphasis added). The ALJ explicitly noted that he considered evidence of Plaintiff's functioning *outside of the structured setting* at both the alternative and mainstream schools.

Furthermore, the ALJ says that he "first evaluated how the child functions in all settings and at all times …. And in evaluating the claimant's limitations, the undersigned has considered the type, extent, and frequency of help the claimant needs to function." (Id.) This is the type of analysis the law requires. For example, the ALJ explicitly noted that J.P. "was in Edgewood Behavioral Home since his regular school could not accommodate him." (Tr. 17) The ALJ was also aware that J.P. transitioned out of that structured environment, but still needed an IEP during the transition to the mainstream school, and that J.P. used a "para-educator," who accompanied him to provide "academic and emotional support." (Id.) The ALJ explicitly noted and discussed

these elements of a structured environment, thus demonstrating his awareness of his obligation to consider the structured environment.[10]

The ALJ considered other evidence of J.P.'s functioning outside of a structured environment. For example, the ALJ considered the testimony of Plaintiff (J.P.'s mother) at the administrative hearing. She testified as to J.P.'s behavior at home, which was mixed. (Tr. 39-53) Plaintiff testified that J.P. fights with his sister and becomes verbally as well as sometimes physically abusive; but she also made statements to doctors that J.P. was "doing well, and [was] getting along better with everyone in the house. She noted that he had a good week at home and in social activities." (Tr. 42, 534) This is highly relevant evidence concerning J.P.'s functioning outside of a structured environment which the ALJ considered and incorporated into his reasoning.

These statements about J.P. doing well socially and around the house (i.e., outside of the structured school environment) are consistent with treatment notes from J.P.'s doctor on March 21, 2012, April 4, 2012, April 18, 2012, April 25, 2012, and May 2, 2012. (See, e.g., Tr. 536) ("[Plaintiff] has done well this week [,with] very little [sic] problems at home. He has been getting along better with everybody in the house.") These notes demonstrate that J.P. was doing fairly well around the house, and getting along well socially, outside of the structured environment of school. This medical evidence discusses J.P.'s functioning outside of the structured environment at school. These notes were obviously considered by the ALJ because he

_____

[10] The presence of a structured environment does not, without more, mean that Plaintiff is disabled. See 20 C.F.R. § 416.924a(b)(7)(iv) ("The fact that you do or do not receive special education services does not, in itself, establish your actual limitations or abilities. Children are placed in special education settings, or are included in regular classrooms (with or without accommodation), for many reasons that may or may not be related to the level of their impairments.").

specifically cited to them, thus fulfilling the obligation to take into account evidence and functioning "outside of the structured environment."  (Tr. 534-545)

The ALJ also considered some evidence from Dr. Delaney concerning Plaintiff's functioning outside of the structured environment.  In treatment sessions with Dr. Delaney, J.P.'s mother indicated that J.P. "had no major problems in school, *he was sleeping well, and he was active in riding his bike and skateboard outside*."  This is additional evidence of J.P.'s functioning outside of the structured setting of school which the ALJ specifically incorporated into his findings.  (Tr. 25)

Finally, the ALJ also noted, and incorporated into his rationale, the evidence that J.P.'s "therapist accompanied the claimant to a restaurant to observe him in a social setting, which resulted in him doing very well.  [And] the claimant indicated that he had a friend over during the prior week."  (Tr. 17)  Both of these pieces of evidence from the medical records, are evidence concerning J.P.'s functioning outside of a structured environment incorporated into the ALJ's reasoning.

These examples demonstrate that the ALJ at least *considered* evidence of J.P.'s functioning outside of the structured environment of his school setting, where he was assisted in his functioning by the paraprofessional.  Because he considered such evidence, the ALJ discharged his duty under the regulations.  See 20 C.F.R. § 416.924a(b)(5)(iv)(E); see also T.C. ex. rel. Z.C. v. Commissioner of Social Security, 497 Fed. Appx. 158, 161 (3rd Cir. 2012) (holding that an ALJ sufficiently considered a child's structured setting where the ALJ recognized that: (1) the claimant had been referred to the school's resource center for assistance; (2) had difficulty functioning independently; (3) had trouble following instructions and focusing in school and at home; (4) had been given a full time aide to assist him in school; and (5) the

claimant was attending speech and occupational therapy two times per week in a self-contained special education classroom).

**B.  ALJ's Treatment of Medical Opinion Evidence**

Plaintiff's second argument is that the Commissioner did not give proper weight to the opinion of J.P.'s treating psychiatrist, Dr. Delaney.  (ECF No. 16 at 8)  Dr. Delaney found that J.P. had marked limitations in the domains of:  (1) attending to and completing tasks; (2) caring for himself; and (3) interacting and relating with others.  Additionally, Dr. Delaney found that J.P. had moderate limitations in a few areas of acquiring and using information, and moving about and manipulating objects.  (Tr. 572-77)  Findings of this severity, if accepted, would have entitled J.P. to benefits under the regulations.  The ALJ, however, found that the record "fails to support marked limitations in attending and completing tasks or in caring for [oneself]."  (Tr. 18)  The ALJ therefore, only partially credited Dr. Delaney's opinion.

Under the law, an ALJ must give "controlling weight" to a treating physician's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.  Wagner v. Astrue, 499, F.3d 842, 848-49 (8th Cir. 2007); see also 20 C.F.R. § 416.927(c)(2).  Further, even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.  Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015).

On the other hand, a treating physician's opinion may be discounted where it provides conclusory statements only, or is inconsistent with the record, and may be discounted or disregarded where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions.  Id.

Plaintiff contends that the ALJ violated these principles in two ways. First, Plaintiff argues that the ALJ was substantively wrong to discount Dr. Delaney's opinion because Plaintiff believes Dr. Delaney's opinion was entitled to controlling weight. (ECF No. 16 at 9) Second, Plaintiff argues that even if Dr. Delaney's opinion was not entitled to controlling weight, the ALJ was required to adequately *explain* the weight that he gave to Dr. Delaney's opinion. (Id.)

Defendant responds by arguing that the ALJ was correct in discounting Dr. Delaney's findings because Dr. Delaney's opinion was inconsistent with other opinion evidence in the record, inconsistent with her own treatment notes, and not supported by the record as a whole. Also, Defendant argues that the ALJ properly explained this finding. (ECF No. 17 at 7-12)

The Court will address Plaintiff's second issue first. Plaintiff's argument is unavailing because the ALJ explained in some detail the weight that he assigned to Dr. Delaney's opinion. (Tr. 18) The ALJ was not required to recite the precise level of weight given to the opinion by using a specific term with specific citations to § 416.927. The ALJ needed only to clarify whether he discounted the physician's opinion, and why. See Grable v. Colvin, 770 F.3d 1196, 1201-02 (8th Cir. 2014). The ALJ did this. The ALJ recognized that Dr. Delaney was a treating psychiatrist, and did not simply reject the findings of Dr. Delaney, but thoughtfully considered each of her individual conclusions. For example, the ALJ noted that Dr. Delaney's findings concerning the domain of interacting and relating to others was supported by the extensive evidence in the record. The ALJ agreed that J.P. "ha[s] trouble socially and he has difficulty getting along with peers." (Id.) The ALJ also noted that the record supported her findings of less than marked limitations in health and physical well-being due to his obesity. (Id.) The ALJ

noted that his disagreement was limited to Dr. Delaney's findings that J.P. suffered "marked" limitations in (1) attending and completing tasks, and (2) in caring for himself.[11]

Therefore, to the extent that Plaintiff argues that the ALJ did not give a specific weight to Dr. Delaney's opinion, and specifically cite to the regulatory factors at § 416.927, the Court disagrees with this conclusion for the reasons stated above. Additionally, these are allegations of deficient opinion writing. An arguable deficiency in opinion writing is not a basis for reversal where the substance of the ALJ's analysis is conducted in accordance with the law. See Buckner v. Astrue, 646 F.3d 549, 559 (8th Cir. 2011) ("[A]n arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome.") (citing Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). The ALJ met his duty to thoughtfully engage with Dr. Delaney's opinions.

Moving on to the substance of the ALJ's treatment of Dr. Delaney's opinion, the Court agrees with Defendant that where the ALJ discounted Dr. Delaney's opinion, he did so in accordance with the law. As an initial matter, the Court notes that the doctor's opinion was in checklist form, without analysis or citation to medical evidence. (Tr. 571-77) The ALJ could properly take into account the conclusory nature of this evidence when assigning weight to it. See Anderson v. Astrue, 696 F.3d 790, 793-94 (8th Cir. 2012) (noting that "a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration'") (internal citations omitted). Also, as a substantive matter, Dr. Delaney's conclusions that J.P. suffered from marked limitations in the domains of (1) attending and completing tasks, (2) and in caring for himself, were properly discounted, as discussed below.

---

[11] The ALJ also noted that the record does not support any limitations relating to J.P.'s ability to acquire and use information or in his abilities to move about and manipulate objects. (Tr. 20, 24) The Court will not further address these differences between Dr. Delaney and the ALJ, however, because they are not dispositive.

### 1. **Domain of Attending and Completing Tasks**

First, Dr. Delaney's conclusion that J.P. suffered "marked" limitations in attending and completing tasks is belied by J.P.'s educational record. In this domain, the ALJ was required to evaluate how well J.P. is able to focus and maintain attention; how well he begins, carries through, and finishes activities; and the pace at which he performs activities and the ease with which he changes them. See 28 U.S.C. § 416.926a(h).

As noted above, when J.P. transferred to his new school, he was in normal classes 96.9 percent of the time. (Tr. 173) J.P.'s transcripts show that he achieved almost all A's and B's, and was on the honor roll. (Tr. 396) J.P.'s teachers commented that he had good class participation, "always tries," and "has a pleasant personality." (Tr. 397) This level of academic success—in normal classes—is simply not consistent with "marked" limitations in attending and completing tasks. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 723 (8th Cir. 2005) (noting that grades which "were nearly all [A's]" support a conclusion that a claimant "did not have marked impairment in the area of attending and completing tasks"); see also Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003) (noting that a claimant's ability to achieve "above-average grades in his classroom setting" supports a finding that the claimant had less than marked limitations in the area of attending and completing tasks). The fact that Dr. Delaney's opinion regarding this domain is inconsistent with the record is a legitimate ground upon which to discount her opinion. See Papesh, 786 F.3d at 1132.

Additionally, Dr. Delaney's conclusions regarding this domain were inconsistent with other, credible evidence. For example, both Mr. Haessig (J.P.'s teacher at the special school) and Dr. Singer (the State agency doctor) thought J.P. did not suffer from marked limitations in his ability to attend and complete tasks. (Tr. 153-59, 546-52) Mr. Haessig specifically found

that J.P. had mostly moderate limitations in attending and completing tasks.  (Tr. 155)  Mr. Haessig also thought that J.P. had mostly no difficulties at all in caring for himself, with only a few moderate exceptions and one marked difficulty concerning periods of unprovoked fear.  (Tr. 157)  In his written comments, Mr. Haessig said only that when J.P. "is stressed he has significant trouble interacting with others."  This is consistent with the ALJ's analysis.

Mr. Haessig's analysis is significant, because he was someone who had the opportunity to observe J.P.'s functioning in depth on a daily basis, and therefore, his opinion was entitled to significant weight under the Commissioner's regulations.  See Social Security Ruling 06-03p. (noting that an opinion from a non-medical source like a teacher may, under certain circumstances, properly outweigh the opinion of a medical source, including a treating source).

Additionally, as noted in the factual discussion above, Dr. Singer, the State's non-examining doctor, found that J.P. had marked limitations in interacting and relating to others, but no other limitations.  (Tr. 546-52)  Although the ALJ ultimately did not endorse Dr. Singer's conclusions in their entirety,[12] her conclusions that J.P. has less than marked limitations in attending and completing tasks or in caring for himself are consistent with the ALJ's conclusions.  At the same time, Dr. Singer's conclusions are inconsistent with Dr. Delaney's. Inconsistency with other, credible opinion evidence is a proper basis upon which to discount Dr. Delaney's conclusions that J.P. suffered marked limitations in attending and completing tasks. See Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007).

Stated another way, J.P.'s educational record, combined with the opinions of Dr. Singer and Mr. Haessig, provides substantial evidence to support the ALJ's finding that J.P. suffers

---

[12] As noted above, the ALJ agreed with Dr. Singer's assessment regarding the domain of interacting and relating to others, but disagreed that J.P. had no other limitations.  Instead, the ALJ thought that J.P. had "less than marked" limitations in the remaining domains.  (Tr. 18)

from less than marked limitations in this domain because a reasonable mind could support this conclusion. See Wildman, 596 F.3d at 965 ("Substantial evidence is … enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.").

## 2. **Domain of Caring For Oneself**

Substantial evidence also supports the ALJ's decision to discount Dr. Delaney's finding that J.P. suffered from marked limitations in caring for himself. This domain focuses upon how well a child such as J.P. maintains a healthy emotional and physical state, including how well physical and emotional needs and wants are met in appropriate ways, how well a child like J.P. copes with stress and changes in his environment, and whether he takes care of his own health, possessions, and living area. See 20 C.F.R. § 416.926a(k).[13]

Dr. Delaney, in discussing the domain of caring for self, had mixed findings. Out of the 20 areas within the "caring for self" domain, Dr. Delaney found J.P. had moderate or no difficulties in 12 of the areas. (Tr. 575) Dr. Delaney found that J.P. had marked difficulties in the 8 remaining areas, including: following proper nutritional expectations; following through on reaching goals; periods of unprovoked fear or anxiety; being unable to enjoy or fully participate in group activities; disturbance in eating or sleeping patterns; has sense of humor or laughs freely; is willing to be consoled when sad; and

---

[13] For school-age children like J.P. (age 6-12), age appropriate ability to care for oneself includes being independent in most day-to-day activities (e.g. dressing, bathing), although they may still need to be reminded sometimes to do these routinely. They should begin to recognize that they are competent in doing some activities and that they have difficulty with others. They should be able to identify those circumstances when they feel good about themselves and when they feel bad. They should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. They should begin to demonstrate consistent control over their behavior, and they should be able to avoid behaviors that are unsafe or otherwise not good for them. They should begin to imitate more of the behavior of adults they know. See 20 C.F.R. § 416.926a(k)(2)(iv).

demonstrates emotions. (Id.) Dr. Delaney additionally commented that J.P. "overeats, [is] prone to anxiety, fears at bedtime, does not like to sleep alone [sic]." (Id.)

The ALJ properly discounted Dr. Delaney's conclusions with regard to this domain. First—as already discussed above— Dr. Delaney's conclusions are in checklist form, without citation to medical evidence. This is a proper basis upon which to discount her opinion. Anderson, 696 F.3d at 793-94.

Also, Dr. Delaney's opinion evidence was inconsistent with other significant opinion evidence in the record, including that of Mr. Haessig. (Tr. 157) Mr. Haessig disagreed with Dr. Delaney's assessment that J.P. suffered from marked limitations in following proper nutritional expectations, following through on reaching goals, being unable to enjoy or fully participate in group activities, or that J.P. had marked limitations in his sense of humor, or demonstrating emotions. (Id.)

This is important because Mr. Haessig was someone who had the opportunity to observe J.P.'s functioning in-depth on a daily basis, and therefore, his opinion was entitled to significant weight under the Commissioner's regulations. See Social Security Ruling 06-03p. (noting that an opinion from a non-medical source like a teacher may, under certain circumstances, properly outweigh the opinion of a medical source, including a treating source). Where Dr. Delaney's opinions are inconsistent with other substantial opinion evidence in the record, that is an acceptable ground upon with to discount her opinion. See Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) ("As there is conflicting evidence on the record, the ALJ's determination …. Does not lie outside the available zone of choice.") (quoting Travis, 477 F.3d at 1042).

Other medical evidence is also inconsistent with Dr. Delaney's findings. For example, during his transition from the alternative to the mainstream school, J.P. attended counseling

sessions with Bruce Miller, a Licensed Clinical Social Worker. (Tr. 636-648) At the initial

assessment on September 6, 2013, J.P.'s mental status screening was entirely within normal

limits, except for "some obsessive habits" and Asperger's. (Tr. 644) There were no issues with

self-care, and no evidence of risk of suicide, violence, or physical abuse. (Tr. 644) At

counseling sessions over the next couple of months, J.P.'s mother noted that J.P. was doing well

at school, where he is "content and cooperative," and J.P.'s "irritable behaviors are limited to the

home." (Tr. 636) This is more evidence that Dr. Delaney's findings regarding self-care are not

supported by the record as a whole, and are therefore, properly discounted. See Papesh, 786

F.3d at 1132.

Additionally, Dr. Delaney's opinion is internally inconsistent. She states that J.P. has a

"lot of limitations socially," and yet, J.P.'s GAF score at the time Dr. Delaney gave her opinion

was 60, which is at the top end of the moderate range of symptoms, and close to the mild range.

(Tr. 577)[14] This inconsistency is a proper basis upon which to discount Dr. Delaney's opinion.

See Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012) (holding that physician opinions "that

are internally inconsistent" are entitled to less deference than they otherwise would be). Dr.

Delaney's opinions are also inconsistent with her own treatment notes. For instance, in

December of 2013, after J.P. had left the more structured environment of his alternative school,

Dr. Delaney's treatment notes indicate that J.P. "has been doing well at school," and he had been

"playing with a group of kids at school." (Tr. 649) After adjusting J.P.'s medication, he was

"eating more normal," and "[h]is sleep has been good." (Id.) Dr. Delaney further noted mild

findings in her mental status examination that day, including that J.P.'s speech "is spontaneous

---

[14] GAF stands for Global Assessment of Functioning score. It is a numeric scale ranging
from 0-100 which is used to rate social, psychological and occupational functioning. See Pate-
Fires v. Astrue, 564 F.3d 935, 937, n.1 (8th Cir. 2009). A score of 60 is at the top end of the
range of moderate symptom. A score within 61-70 would be in the mild range of symptoms.

and fluent. Thought process is goal directed. No suicidal or homicidal ideations. No delusions or hallucinations." (Id.) These objective observations in Dr. Delaney's notes are inconsistent with marked limitations in J.P.'s ability to care for himself.

As a final matter, evidence of J.P.'s daily activities, as discussed in his daily activity report, presents mixed evidence concerning J.P.'s ability to care for himself. As the ALJ notes, J.P. has some difficulties in performing certain tasks himself, such as buttoning clothes, taking a bath alone, brushing his teeth, and washing or combing his fair, but yet he is also able to use a zipper by himself, tie shoelaces, choose his clothes, do what he is told most of the time, and get to school on time. (Tr. 119-20) Where evidence is mixed, or there is conflicting evidence, it is the job of the ALJ to resolve that conflict. Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("It is the ALJ's duty to resolve conflicts in the evidence."). The ALJ has done so in this case, and his decision is within the zone of reasonableness. This Court will defer to the determination of the ALJ. See Buckner, 646 F.3d at 556 (noting that a reviewing court will not disturb the ALJ's decision unless it falls outside of the zone of reasonableness).

For all of the above reasons, the ALJ analyzed Dr. Delaney's medical opinion evidence in accordance with the law, and the weight given to her opinion is permissible.

## IV. **Conclusion**

For all of the foregoing reasons, Plaintiff's arguments that the ALJ erred are unavailing. The ALJ thoroughly evaluated the evidence in this case, and gave Plaintiff a full and fair hearing. This is a case where the Court's deferential standard of review is important. This is a difficult case. Although reasonable jurists might have weighed the evidence in this case differently, the ALJ's decision is within the "zone of reasonableness," and therefore must be affirmed. See Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (stating that "[a]n ALJ's decision is not

outside the zone of choice simply because [the court] might have reached a different conclusion had [the court] been the initial finder of fact'") (quoting <u>Bradley v. Astrue</u>, 528 F.3d 1113, 1115 (8th Cir. 2008)).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Administrative Law Judge in this matter be affirmed.

A separate Judgment shall be entered this day.

/s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of July, 2016